## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | : |
|  | : **CHAPTER 7** |
| **Anthony J. DeMarco, III** | : |
|  | : **BANKRUPTCY NO. 10-13033(MDC)** |
|  | : |
|  | : |
| **DEBTOR** | : |
|  | : |
|  | : |
| **Kevin J. Hart,** | : |
|  | : **ADVERSARY NO.:** |
| **Plaintiff,** | : |
| **v.** | : |
|  | : |
| **Anthony J. DeMarco, III and** | : |
| **DeMarco REI, Inc. and John Doe 1-99,** | : |
|  | : |
| **Defendants.** | : |
|  | : |

## COMPLAINT IN OBJECTION TO DISCHARGE OF DEBTOR
## AND FOR OTHER RELIEF

### I.    INTRODUCTION

Plaintiff, Kevin J. Hart ("Hart"), by and through his undersigned counsel, Ciardi Ciardi & Astin, ereby files this Complaint Objecting to Discharge of Debtor pursuant to 11 U.S.C. 727 and 11 U.S.C. §523 and Bankruptcy Rule 4004(d) and 7001(4) of the Federal Rule of Bankruptcy Procedure.  Harte objects to the discharge of the Debtor and seeks additional relief for Debtor's numerous violations of federal and state law in furtherance of a home sale-lease back scam orchestrated by Debtor and others.

1

## II.    JURISDICTION & VENUE

1.      The United States Bankruptcy Court for the Eastern District of Pennsylvania has jurisdiction over this claim pursuant to 11 U.S.C. §1134 and venue is proper pursuant to 28 U.S.C. §1409.  The Court also has supplemental jurisdiction to hear all state law claims under 28 U.S.C. §1367.

2.      This is considered a core proceeding under 28 U.S.C. §157.

## III.    PARTIES

3.      Plaintiff, Kevin J. Hart is a creditor of Debtor who resides in the Commonwealth of Pennsylvania with a residential address of 112 Raven Hollow Drive, North Wales, Montgomery County.

4.      Debtor and Defendant, Anthony J. DeMarco, III ("DeMarco" or "Debtor") is an individual resident of the Commonwealth of Pennsylvania residing at 112 N. 2nd Street, Unit 4H, Philadelphia, Philadelphia County.

5.      Defendant, DeMarco REI, Inc. ("DeMarco REI") is a defunct business entity that served as nothing more than an alter-ego of DeMarco who has abandoned its only known business address located in the Commonwealth of Pennsylvania at 1500 JFK Boulevard, Suite 222 in Philadelphia, Philadelphia County.

6.      Defendant John Doe 1-99 is a natural person or business entity who at all time material to the events herein described acted in concert and/or under the direction of Debtor.  All Defendants will collectively be referred to as the "DeMarco Defendants."

## IV.    FACTS COMMON TO ALL DEFENDANTS

7.      In the midst of the worst economic recession in recent memory, DeMarco, through his direct control of DeMarco REI, is conducting a widespread, multi-state home

sale-leaseback scam that has defrauded hundreds of distressed homeowners and unwitting "investors" out of millions of dollars.

8.      The DeMarco REI website states:

**"Your house is your home, don't loose (sic) it to foreclosure."**

DeMarco REI, Inc. is Real Estate Investment company that not only invests in Real Estate, but in people. We are dedicated to providing a safe and secure alternative to loss associated with foreclosure. We strive to help families facing foreclosure save their homes and improve their financial situations. Our mission is to enable our clients to have a second chance at a financial future. Once a client enters into one of our programs, we work diligently to restore their credit. We keep our clients in their homes, avoiding displacement due to a sheriff's sale.

## HOW THE SCAM WORKS

9.      *Step 1*: DeMarco reviews pending sheriff sale notices to identify homes on the verge of foreclosure. He then approaches the distressed homeowner and offers to find "investors" who will purchase their home, pay off the mortgage balance and then lease the home back to them.

10.     *Step 2*: Through newspaper advertisements offering "business opportunities" in real estate, DeMarco lures potential "investors" with superior credit scores by representing that he can assist them in obtaining mortgages to purchase pre-foreclosure homes to assist families facing foreclosure, and that they will also receive several thousand dollars in cash at closing. The "investor" is then assured that the lease payments of the tenant (the former homeowner) will be sufficient to pay the monthly mortgage note. In order to qualify for the mortgage, the "investor" is asked to provide detailed financial information such as tax returns, banks statements and personal credit reports.

3

11.     *Step 3:* DeMarco then hires a real estate appraiser to provide an appraisal that drastically inflates the value of the home, prepares and signs the "investor's" mortgage application, and employs his network of mortgage brokers to procure a mortgage.

12.     *Step 4*: At or before the closing, DeMarco induces the homeowner to pay a huge fee for a one year option that gives them the right to repurchase the home at the artificially inflated appraised value minus the option payment. On the day of closing DeMarco deducts the excessive option fee (in one case $35,000) from the loan proceeds due the seller. After the existing mortgage is paid off, along with other fees and costs, the homeowner receives nothing. DeMarco also fails to pay the "investor" the promised several thousand dollars at the closing.

13.     *Step 5:* At or before the closing, DeMarco induces the homeowner to execute a one year lease with DeMarco as the landlord, typically at a higher monthly rate than their existing mortgage payments. Rather than using these payments to pay the mortgage on behalf of the "investor" DeMarco then illegally converts these funds to his own use, leaving the "investor" in default.

14.     This scam was carried out by the DeMarco Defendants after the financial meltdown of the previous year.

<u>**A PHILADELPHIA CASE STUDY OF THE SCAM:**</u>
<u>**4546 NORTH FRONT STREET**</u>

<u>Finding the Property</u>

15.     Upon information and belief, Defendant DeMarco REI, through its president, DeMarco, targeted the property found at 4546 North Front Street in the City of Philadelphia, Pennsylvania (the "Philadelphia Property") after discovering the

Philadelphia Property to be on the verge of sheriff sale through Philadelphia County
Sheriff Sale Publications.

<u>Getting the Property Owner On Board</u>

16.    DeMarco then approached Ms. Aureo Ocasio ("Ocasio"), the distressed
homeowner of the Philadelphia Property and offered to find "investors" who would
purchase her home, pay off the mortgage balance and then lease the home back to her.

<u>Finding an "Investor"</u>

17.    While DeMarco was approaching distressed homeowners such as Ocasio,
Plaintiff Harte discovered an advertisement in the "Business Opportunity" section of the
<u>Philadelphia Inquirer</u> announcing investment opportunities.

18.    The advertisement appeared in multiple consecutive Sunday Editions and
read:

> No Investment Required!
> Make $20000-$30000
> All you need is good credit & stable employment.
> Times are tough stop living paycheck to paycheck.
> Call Buzz today!
> 267-886-1627

19.    In response to the advertisement, Harte contacted DeMarco REI and
inquired as to how to become an investor.

20.    Shortly thereafter, Harte was contacted by DeMarco REI's representative,
Bayard "Buzz" Wagenseller.

21.    Wagenseller represented to Harte that DeMarco REI and DeMarco could
assist Harte in obtaining mortgages to purchase pre-foreclosure homes with no down
payment, and that Harte would receive several thousand dollars in cash at closing.  All

Harte had to do was supply certain documents to DeMarco REI to determine if he was a qualified "investor."

22.    On or about November 7, 2009, Harte forwarded various documents ("Harte's Documents") to DeMarco REI including, *inter alia*, pay stubs, W-2's, tax statements, a letter of employment and bank statements.

The "Investor" Contract

23.    Based on Harte's tremendous credit score and employment record, DeMarco REI, DeMarco and Wagenseller were quick to "approve" him as an investor and a contract (the "Contract") was executed by DeMarco and Harte.  Attached is a true and correct copy of the Contract (Exhibit "A").

24.    Harte was assured by Wagenseller and through the Contract that the lease payments of the tenant (the former homeowner) would be sufficient to pay the monthly mortgage note.  The Contract states:

> I, Kevin Harte do agree to become an investor for DeMarco REI, Inc., giving me the opportunity to purchase real estate which has been identified by DeMarco REI, Inc. with money provided, interest free, by DeMarco REI, Inc.  I understand that I will not be responsible for any charges or expenses associated with these transactions, including any down payment.  **Demarco REI, Inc. will also arrange for a sum ranging between $4,000 and $6,000 be taken from the principal of the property value and given to the investor within ten (10) days of the closing transaction.**

> I understand that the property purchased will be immediately leased back to the previous owners and that DeMarco REI, Inc. will be responsible for paying the rent,   the taxes, obtaining and paying the insurance and handling any other responsibilities associated with leasing the property including maintaining the property in satisfactory condition.

> If the lessees do not repurchase the property within approximately one year, the investor agrees to allow DeMarco REI, Inc. to sell the property, on the investor's behalf  without any commission incurred by the investor.  All profits (and losses) and expenses  connected with the sale shall go to (and be incurred by) DeMarco REI, Inc. including any capital gains.  If the lessees do repurchase the property,

6

DeMarco REI, Inc. will incur all the expenses normally paid by the investor or as a result of this sale. If the property is held on the lessees for more than one year, the investor may be compensated appropriately by DeMarco REI for each year thereafter.

Furthermore, **DeMarco REI, Inc. agrees to protect the credit of the investor to the best of his ability. This means that they will pay all mortgage payments on time and will also pay any expense connected to this property in a timely fashion.**

*See* Exhibit "A" (emphasis added).

The Inflation of the Property Value

25.    DeMarco then hired an appraiser to supply an appraisal of the Philadelphia Property.

26.    Defendant DeMarco and the appraiser had, upon information and belief, agreed that the appraisal of the Philadelphia Property would be an appraisal that drastically inflates the value of the Philadelphia Property.

27.    DeMarco's appraisal of the Philadelphia Property, which is a row house in a poor section of North Philadelphia, gave a value of $170,000.00.

28.    Upon information and belief, the Philadelphia Property, when properly appraised is valued at no more than $75,000.00.

Securing a Mortgage

29.    After securing Harte's Documents, DeMarco then used the information contained therein to prepare and sign "Harte's" mortgage application.[1]

30.    DeMarco then, unbeknownst to Harte, submitted the fraudently signed application to Millennium Mortgage who approved a loan to purchase the Philadelphia Property, in Harte's name, for $136,000.00 at a rate of 6.5%.

---

[1] Although this section of the Complaint focuses only on the Philadelphia Property, it must be noted that of the four (4) properties Harte became involved in, he DID NOT sign a single mortgage application.

<u>The Closing</u>

31.    After lining up the Philadelphia Property and securing Harte as the "investor," DeMarco REI, DeMarco and Wagenseller arranged for the closing to take place on January 30, 2009 at DeMarco REI's office located in center city Philadelphia.

32.    Present at the closing were Harte, Wagenseller and unknown individuals presumed to be employees of DeMarco REI.

33.    Suspiciously absent at the closing were the seller, Ocasio, Anthony DeMarco, any representative from Millennium Mortgage or CitiMortgage and Lisa Lombardo despite the fact that she apparently notarized many documents on the same date.

34.    The closing lasted approximately thirty (30) minutes and consisted of Wagenseller placing documents in front of Harte and indicating where Harte should affix his signature.

35.    On the day of closing, DeMarco REI deducted an excessive option fee in the amount of $34,000.00 from the loan proceeds due to Ocasio; as well as, additional "investor fees" and "legal fees."  Attached is a true and correct copy of DeMarco REI's invoice to Ocasio dated January 30, 2009 (Exhibit "B").

36.    On the day of the closing, Ocasio's existing mortgage, in the amount of only $52,515.65, was paid off from the proceeds of the new mortgage secured in Harte's name.

37.    On the day of the closing, Ocasio and DeMarco REI entered into a one-year lease agreement wherein Ocasio was the tenant and the landlord was DeMarco REI, Inc. and Kevin Harte.

38.    After the closing, the net result is that:

    a.    Kevin Harte owned the Philadelphia Property with a $136,000.00 mortgage note that is already in arrears;

    b.    Ocasio went from owning the Philadelphia Property and owing approximately $55,000.00 to being a tenant and paying larger rental payments to DeMarco REI than she was paying on her previous mortgage.  Ocasio received no other proceeds; and

    c.    DeMarco received over $100,000.00 and disappears.

### DeMarco REI, DeMarco and Wagenseller String Harte Along

39.    Pursuant to the Contract, Harte was to receive between $4000.00 and $6000.00 from DeMarco REI for his "investment."

40.    Harte made several inquiries and demands for payment of the investor fee to both Anthony DeMarco and Wagenseller and was repeatedly promised he would be compensated per the contract.

41.    Particularly, DeMarco replied on March 23, 2009 in an email to Kevin Harte that his "investor fee" would be paid.

42.    Further, Wagenseller replied on March 17, 2009 in an email to Kevin Harte that DeMarco REI would be paying Harte's "investor fee."

43.    The Contract also stated, "DeMarco REI, Inc. agrees to protect the credit of the investor to the best of his ability.  This means that they will pay all mortgage payments on time and will also pay any expense connected to this property in a timely fashion."

44.    The closing for the Philadelphia Property took place on January 30, 2009 and the first mortgage payment was due to CitiMortgage on March 1, 2009.

45.     Despite the assurances of DeMarco and Wagenseller and the written Contract, the first mortgage payment for the Philadelphia Property was thirty (30) days late.

46.     The second mortgage payment for the Philadelphia Property was made twenty-six (26) days late.

47.     The third mortgage payment for the Philadelphia Property was made twenty-eight (28) days late.

48.     The fourth mortgage payment for the Philadelphia Property was made twenty-three (23) days late; however, on July 6, 2009 Harte received notice that there were insufficient funds in DeMarco REI's account.

49.     To date, the last payment DeMarco REI made on the Philadelphia Property mortgage with CitiMortgage was the late third payment that cleared on May 29, 2009.

50.     Each late payment by DeMarco REI and payment with insufficient funds has been reported to the credit agencies and has drastically impacted Harte's credit score.

51.     Harte constantly called and emailed Wagenseller for an explanation and assurance that the Philadelphia Property mortgage would be brought current.

52.     Both Wagenseller and DeMarco replied with assurances that the Philadelphia Property mortgage would be paid immediately.

53.     This, of course, never happened and DeMarco REI and DeMarco have not returned calls or emails since March 2009.

<u>DeMarco REI Closes its Doors and Anthony DeMarco and Biana Tsepenyuk (Demarco)</u>
<u>Disappear</u>

54.     Sometime between March and July 2009, DeMarco REI closed its doors and vacated its Philadelphia office location.

55.     Harte later learned that, rather than use the rental payments to pay the mortgage on behalf of the Harte (per the Contract), DeMarco, among others, illegally converted the rental funds to his own use, leaving Harte in default to the mortgage company and the tenant, Ocasio again facing eviction through foreclosure.

56.     The final result of DeMarco "assisting Ocasio when facing foreclosure" was that Ocasio lost the title to her home and the "investor," Harte, is in default on the Philadelphia Property mortgage note in an amount in excess of $136,000.00; all of this while DeMarco absconded with over $100,000.00 collected at closing through various fees and option payments as described above.

**Three (3) Other Properties**

57.     Before Harte had any inclination of the scam being perpetrated by DeMarco REI, DeMarco and John Doe, DeMarco was able to convince Harte to invest in four (4) total properties.[2]

58.     Over a period of less then two (2) months, during one of the worst economic crises the nation has ever experienced, DeMarco, DeMarco REI and Wagenseller were able to get Harte approved for, and therefore liable for, four (4) mortgages totaling over $630,000.00.

---

[2] Upon information and belief, the predatory home sale-lease back scam, as described herein, has affected nearly 200 properties throughout the greater Philadelphia region.

59.    Although the Philadelphia Property was used as an example of the scheme, the first property Harte "invested" in Willingboro, New Jersey.

The Willingboro Property

60.    On or about December 10, 2008, Harte, with the assistance and under the guidance of DeMarco REI and Wagenseller entered into a mortgage agreement with Freedom Mortgage Corp. - LoanCare Servicing Center, Inc. to purchase property situated at 11 Hampton Lane, Willingboro, New Jersey (the "Willingboro Property").

61.    The Willingboro Property was purchased from Carey and Florence Brown, whom were facing foreclosure, at a price of $195,000.00 and leased back to them at a rate of $1300.00 per month by DeMarco REI on behalf of the "investor" Harte.

62.    Harte, again, never drafted or executed a mortgage application, yet Freedom Mortgage Corp approved Harte for a mortgage amount for the Willingboro Property of $156,000, with the first payment due February 1, 2009.

63.    The closing for the Willingboro Property took place at DeMarco REI's Philadelphia office and only Wagenseller and a few other people were present.

64.    Suspiciously, a Mark Lombardo was the notary public allegedly witnessing the required signatures for the closing to take place.

65.    Mark Lombardo notarized many of the documents that were presented to Harte for signature, but he also notarized the Browns' signatures on the same day. This is suspicious because the Browns, although present that day at DeMarco REI's office, did not participate in the closing with Harte and Wagenseller.

66.    The terms and conditions of the Contract Harte which signed with DeMarco REI were in effect at the time that Harte "invested" in the Willingboro

Property; i.e., DeMarco REI was responsible for making the mortgage payments through rent collected from the tenant/previous owner and protecting Harte's credit score.

67.    However, as with the Philadelphia Property, the first payment was made to LoanCare Servicing Center, Inc. twenty-nine (29) days late; the second and third payment were thirty (30) and twenty-six (26) days late respectively; and the fourth payment was made twenty-eight (28) days late and was returned because of insufficient funds.

68.    Neither DeMarco REI nor DeMarco have made a mortgage payment for the Willingboro Property since April 2009.

69.    The Willingboro Property is now in default to LoanCare Servicing Center and is again facing foreclosure.

70.    The final result of DeMarco assisting the Browns when facing foreclosure was that the Browns lost the title to her home and the "investor," Harte, is in default on the Willingboro Property mortgage note in an amount in excess of $150,000.00; all of this while DeMarco absconds with over $100,000.00 collected at closing through various fees and option payments as described above.

<u>The Atlantic City Property</u>

71.    On or about January 2, 2009, Plaintiff, with the assistance and under the guidance of DeMarco REI and Wagenseller, entered into a mortgage agreement with Majestic Home Mortgage to purchase property situated at 530 North Harrisburg Avenue, New Jersey (the "Atlantic City Property").

72.    The Atlantic City Property was purchased from Geraldine Nixon, who was facing foreclosure, at a price of $275,000.00 and leased back to them at an unknown rate by DeMarco REI on behalf of the "investor" Harte.

73.    Harte, again, never drafted or executed a mortgage application, yet Majestic Home Mortgage approved Harte for a mortgage amount for the Atlantic City Property of $220,000, with the first payment due February 1, 2009.

74.    The closing for the Atlantic City Property took place at DeMarco REI's Philadelphia office and only Wagenseller and a few other unknown people were present.

75.    Suspiciously, the same Mark Lombardo was the notary public allegedly witnessing the required signatures for the closing to take place.

76.    Mark Lombardo notarized many of the documents that were presented to Harte for signature, but he also notarized the Nixon's signatures on the same day. This is suspicious because Nixon did not participate in the closing with Harte and Wagenseller.

77.    The terms and conditions of the Contract Harte signed with DeMarco REI were in effect at the time that Harte "invested" in the Atlantic City Property; i.e., DeMarco REI was responsible for making the mortgage payments through rent collected from the tenant/previous owner and protecting Harte's credit score.

78.    A total of four (4) payments were made by DeMarco REI on the Atlantic City Property Mortgage; however, all four (4) payments were returned with insufficient funds.

79.    To Date, neither DeMarco REI nor DeMarco have made a mortgage payment for the Atlantic City Property since closing.

80.    The Atlantic City Property is now in default to AmTrust and is again facing foreclosure.

81.    The final result of DeMarco assisting Geraldine Nixon when facing foreclosure was that she lost the title to her home and the "investor," Harte, is in default

on the Atlantic City Property mortgage note in an amount in excess of $220,000.00; all of this while DeMarco absconds with over $100,000.00 collected at closing through various fees and option payments as described above.

## The Gloucester City Property

82.    On or about January 12, 2009, Plaintiff, with the assistance and under the guidance of DeMarco REI and Wagenseller, entered into a mortgage agreement with Gateway Funding to purchase property situated at 2 South Harley Avenue, Gloucester City, New Jersey (the "Gloucester City Property").

83.    The Gloucester City Property was purchased from Karen Harris, who was facing foreclosure, at a price of $142,000.00 and leased back to her at an unknown rate by DeMarco REI on behalf of the "investor" Harte.

84.    Harte, again, never drafted or executed a mortgage application, yet Gateway Funding approved Harte for a mortgage amount for the Gloucester City Property of $113,600.00, with the first payment due March 1, 2009.

85.    The closing for the Gloucester City Property took place at DeMarco REI's Philadelphia office and only Wagenseller and a few other unknown people were present.

86.    Suspiciously, the same Mark Lombardo was the notary public allegedly witnessing the required signatures for the closing to take place.

87.    Mark Lombardo notarized many of the documents that were presented to Harte for signature, but he also notarized the Harris's signatures on the same day. This is suspicious because Harris did not participate in the closing with Harte and Wagenseller.

88.    According to the settlement statement, attorney Paul D. DiGiacomo, Esquire acted as title agent at the closing despite the fact that Harte never met him as he was not present at the closing.

89.    DiGiacomo was also responsible for recording the deed, which he did fourteen (14) days after closing.

90.    The terms and conditions of the Contract Harte signed with DeMarco REI were in effect at the time that Harte "invested" in the Gloucester City Property; i.e., DeMarco REI was responsible for making the mortgage payments through rent collected from the tenant/previous owner and protecting Harte's credit score.

91.    A total of five (5) payments were made by DeMarco REI on the Gloucester City Property mortgage.  All were late and the second and fifth payments were returned because of insufficient funds.

92.    To Date, neither DeMarco REI nor DeMarco have made a mortgage payment for the Gloucester City Property since June 23, 2009.

93.    The Gloucester City Property is now in default to GMAC Mortgage Corp. and is again facing foreclosure.

94.    The final result of DeMarco assisting Karen Harris when facing foreclosure was that she lost the title to her home and the "investor," Harte, is in default on the Gloucester City Property mortgage note in an amount in excess of $100,000.00; all of this while DeMarco absconds with over $100,000.00 collected at closing through various fees and option payments as described above.

## COUNT I – OBJECTION TO DISCHARGE

95.    Harte hereby incorporates and restates all preceding paragraphs as if they are set forth at length herein.

96.    Demarco Exercised dominion and control over Defendant DeMarco REI with the intent of using DeMarco REI as a conduit to make profit from the home sale-lease back scam described *supra*.

97.    DeMarco's bankruptcy petition fails to account for assets involved in the transactions described *supra* or his loss of said assets to meet is liabilities in the instant action per Harte's understanding of the large amount of equity debtor illegally obtained through the scam using Harte's name.

98.    Harte avers that based upon the above facts and information to be obtained through discovery, Debtor's actions are in contravention of the provisions of 11 U.S.C. §§ 727 and 523 and are therefore non-dischargeable.

## COUNT II – FRAUDULENT MISREPRESENTATION

(Harte v. DeMarco)

99.    Harte hereby incorporates the above averments as if the same were stated at length herein.

100.    DeMarco REI, Inc. was represented to be saviors of those in need of a helping hand by its CEO and founder Anthony DeMarco.

101.    The newspaper advertisement that Plaintiff responded to described DeMarco REI as a risk free way to make approximately $20,000.00 to $30,000.00 a year and the only requirement was good credit and stable employment.

102.    It was described to Plaintiff by DeMarco, that with Plaintiff's investment, Plaintiff would be assisting persons in danger of losing their homes.

103.    The above utterance, or a similar version thereof, was made to Plaintiff by Defendant DeMarco in or around November or December 2008.

104.    By playing on Plaintiff's heart-strings with the above statements, DeMarco intended to induce Plaintiff into lending his good name and credit score to acquire the aforementioned distressed properties.

105.    Based on the representations described above and the credentials and testimonials listed on DeMarco REI's website, regarding DeMarco REI and DeMarco, Plaintiff's reliance on DeMarco's statements were justified.

106.    However, Plaintiff has since learned that DeMarco had no intentions of helping those persons facing foreclosure.

107.    It is believed and therefore averred that DeMarco ran the above described scam by using Plaintiff's good name and credit to steal hundreds of thousands of dollars that were lent on the basis of fraudulently inflated appraisals.

108.    As a result of Plaintiff's justifiable reliance on the above statements of DeMarco, Plaintiff has suffered monetary damages, a negative impact on his credit; as well as, the knowledge that he has unwittingly participated in a scheme to defraud people in weak and vulnerable positions.

## COUNT III – BREACH OF FIDUCIARY DUTY

(Harte v. DeMarco REI and DeMarco)

109.    Harte hereby incorporates the above averments as if the same were stated at length herein.

110.    As described in detail above, Harte became the owner of the four properties (Philadelphia, Willingboro, Atlantic City and Gloucester City) in or around December 2008 and January 2009.

111.    A particular aspect of the arrangement with DeMarco REI was that DeMarco REI would lease the properties back to their original owners with an option to re-purchase the property after the one year lease expired.  *See* Exhibit "A."

112.    Specifically, the contract states:

> I understand that the property purchased will be immediately leased back to the previous owners and that DeMarco REI, Inc. will be responsible for paying the rent, the taxes, obtaining and paying the insurance and handling any other responsibilities associated with leasing the property including maintaining the property in satisfactory condition.
> *See* Exhibit "A."

113.    DeMarco REI was responsible for collecting the rent from the previous owner/tenant and applying that money to cover Harte's monthly mortgage payment for each respective property.

114.    DeMarco REI, through its founder and CEO Anthony DeMarco collected an unknown amount of rent from each of the four previous owner/tenants.

115.    Said rent money was collected for the purpose of making Harte's mortgage payments per the Contract terms.

116.    Anthony DeMarco and DeMarco REI had a fiduciary duty to make Harte's mortgage payments per the Contract terms.

117.    With the exception of the few mortgage payments made as described above, DeMarco and DeMarco REI have failed to apply the collected rent monies to Harte's mortgage payments.

118.    DeMarco and DeMarco REI have thus breached the fiduciary duty owed to Harte.

119.    Harte has been damaged by DeMarco and DeMarco REI's breach of fiduciary duty in an amount equal to the rent monies collected by DeMarco and DeMarco REI and not paid to the respective mortgagors.

### COUNT IV – CIVIL CONSPIRACY

(Harte v. DeMarco REI, Inc.; Anthony DeMarco and John Doe 1-99)

120.    Harte hereby incorporates the above averments as if the same were stated at length herein.

121.    Harte avers that Anthony DeMarco, DeMarco REI and John Doe 1-99 have conspired together and acted in concert to commit the above described home sale-leaseback scam and intentionally harm Harte by leaving him the sole person liable for over $630,000.00 in mortgages.

122.    Anthony DeMarco orchestrated the conspiracy with the assistance of others DeMarco REI and John Doe 1-99.

123.    Specifically, DeMarco created DeMarco REI with the intent of perpetrating the scam (as described above) upon the "investors," such as Harte; as well as, the previous home owners, such as Ocasio, the Brown, Nixon and Harris.

124.    DeMarco placed the advertisement, described above, in the newspaper with the intent of luring Harte to be an "investor."

125.    DeMarco instructed Wagenseller to request the necessary information and paperwork from Harte with the purpose and intent of drafting forged mortgage applications in Harte's name.

126.    DeMarco did in fact forge Harte's signature upon four (4) mortgage applications.

127.    Or, in the alternative, DeMarco took Harte's signature from another document and applied it to the four (4) mortgage applications.

128.    Wagenseller, upon instruction of Demarco, on December 10, 2008; January 2, 2009; January 12, 2009; and January 30, 3009 orchestrated quick property closings wherein Harte was shown a series of legal documents in a rushed manner and was told where to sign.

129.    DeMarco kept Harte on the hook with the intentionally false assurances that the mortgages would be paid and that Harte would receive his investor fee.

130.    On March 24, 2009, DeMarco stated to Harte that he finally had all of the Mortgage information up to date, that Harte would be receiving his investor fee and apologizing for a late mortgage payment.

131.    All of the above communications from DeMarco to Harte were with the continued intent of allowing time to pass so DeMarco could collect money from the previous owner/tenants while only Harte was left responsible for the mortgage payments.

132.    It is further believed that DeMarco conspired with John Doe to artificially inflate the appraised value of the Willingboro Property, the Atlantic City Property and the Gloucester City Property with the intent that DeMarco would retain the additional cash received in the loan and John Doe appraisers would receive payment from DeMarco while knowing all along that Harte would be the only person liable for the mortgages.

133.    The overall goal of the above described conspiracy was that each of the above named defendants would share a portion of the inflated mortgage proceeds,

including the rent collected from the previous owners/tenants while assuring that Harte would be the only person liable for the mortgage repayment.

134.    Harte was damaged by the conspiracy in that he is liable for over $630,000.00 in mortgages.

## COUNT VII – REQUEST FOR ACCOUNTING

(Harte v. DeMarco REI, Anthony DeMarco)

211.    Harte hereby incorporates the above averments as if the same were stated at length herein.

212.    As described in detail above, Harte became the owner of the four properties (Philadelphia, Willingboro, Atlantic City and Gloucester City) in or around December 2008 and January 2009.

213.    A particular aspect of the arrangement with DeMarco and DeMarco REI was that DeMarco REI would lease the properties back to their original owners with an option to re-purchase the property after the one year lease expired. *See* Exhibit "A."

214.    Specifically, the contract states:

I understand that the property purchased will be immediately leased back to the previous owners and that DeMarco REI, Inc. will be responsible for paying the rent, the taxes, obtaining and paying the insurance and handling any other responsibilities associated with leasing the property including maintaining the property in satisfactory condition.
*See* Exhibit "A."

215.    DeMarco and DeMarco REI was responsible for collecting the rent from the previous owner/tenant and applying that money to cover Harte's monthly mortgage payment for each respective property.

216.    DeMarco REI, through its founder and CEO Anthony DeMarco collected an unknown amount of rent from each of the four previous owner/tenants.

22

217.    Said rent money was collected for the purpose of making Harte's mortgage payments per the Contract terms.

218.    Anthony DeMarco and DeMarco REI had a fiduciary duty to make Harte's mortgage payments per the Contract terms.

219.    With the exception of the few mortgage payments made as described above, DeMarco and DeMarco REI have failed to apply the collected rent monies to Harte's mortgage payments.

219.    Harte must be provided with an accounting of the rent monies collected by DeMarco and DeMarco REI.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Kevin Harte, by and through his undersigned counsel, Ciardi Ciardi & Astin, respectfully demand judgment in his favor and against Defendants, Anthony DeMarco, DeMarco REI, Inc. AND John Doe 1-99 individually, jointly and/or severally in an amount in excess of $75,000.00 together with all costs and fees and any other relief the Court deems appropriate under the circumstances and:

A.    Actual damages in the amount of liability owed by Hart on the four properties;

B.    Treble damages;

C.    Punitive damages;

D.    Attorney fees, expenses and costs;

E.    Other such relied the Court deems appropriate.

## PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

**Ciardi Ciardi & Astin**


Dated: July 23, 2010

By: /s/ Kevin G. McDonald
    Albert A. Ciardi, III, Esquire
    Kevin G. McDonald, Esquire
    One Commerce Square
    2005 Market Street, Suite 1930
    Philadelphia, Pa 19103
    215-557-3550
    215-557-3551 (fax)
    Attorneys for Plaintiff